Filed 9/27/21; see dissenting opinion

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| IAN C. DAE, | B305834 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 18STPB06832) |
| v. | |
| ROBERT TRAVER, as Trustee, etc., | |
| Defendant and Respondent. | |


APPEAL from an order of the Superior Court of Los Angeles County.  Brenda J. Penny, Judge.  Affirmed.

Murtaugh Treglia Stern & Deily, John P. Deily and Devin Murtaugh for Plaintiff and Appellant.

Jeffer Mangels Butler and Mitchell, Susan Allison and Neil C. Erickson for Defendant and Respondent.

_____

Ian C. Dae (Dae) appeals from an order denying his motion to strike a probate court petition under the anti-SLAPP statute. (Code Civ. Proc., § 425.16.)[1] Respondent Robert Traver (Robert) filed the petition in his capacity as trustee of a family trust.[2] Robert's petition alleged that Dae violated a "no contest" clause in the trust by filing a previous petition challenging Robert's actions as trustee.

The parties agree that Robert's petition (the No Contest Petition) arose from protected petitioning activity under Code of Civil Procedure section 425.16, subdivision (e)(1). Thus, under subdivision (b)(1) of that statute, to defeat Dae's motion Robert was required to show a probability that he would prevail on his No Contest Petition.

The trial court found that Robert made such a showing. We agree.

Dae's petition broadly challenged Robert's conduct in setting up a financial structure that Robert claimed was designed to avoid estate taxes. If Robert's claim is true, Dae's petition would implicate the no contest provision by seeking to "impair" provisions in the trust giving Robert the authority to manage trust assets.

Dae also challenged his own removal as a beneficiary. Whether that more specific challenge amounts to a "contest" for purposes of the trust's no contest clause depends upon the

---

[1] " ' "SLAPP" is an acronym for "strategic lawsuit against public participation." ' " (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 785, fn. 1.)

[2] Other than Dae, we use first names because some family members have the same surname. No disrespect is intended.

trustors' intent. Robert provided sufficient evidence of the trustors' intent to allow a change of beneficiary to make a prima facie showing of probability of prevailing on Robert's contention that Dae's claims are a "contest." Our conclusion is limited to the context in which it arises—an anti-SLAPP motion. We express no opinion on how the probate court should ultimately rule on Robert's petition.

## BACKGROUND[3]

### 1.    The Family Trust

Erin and Jean Walsh (the Trustors), a married couple, established a family trust in 1994 (Family Trust). Jean had three children from a prior marriage—Joan, William, and Robert. Erin had no children.

Joan had one child—Dae. William had no children. Robert has three children.

The Family Trust provided that, when one of the Trustors died, the assets of the Family Trust would be divided into a Survivor's Trust, a Residuary Trust, and a generation skipping trust for the grandchildren. The Survivor's Trust was to be funded with the community property interest of the surviving trustor and was revocable during the surviving trustor's lifetime.

Aside from some specific bequests and the funding of the generation skipping trust (which is not at issue here), the remainder of the deceased trustor's community property interest was to fund the Residuary Trust. The Residuary Trust was irrevocable.

---

[3] We summarize the facts in the light most favorable to Robert, the party opposing the anti-SLAPP motion. (*Murray v. Tran* (2020) 55 Cal.App.5th 10, 16.)

3

The Family Trust designated the surviving trustor and Robert as the trustees of the Residuary Trust. Those trustees were given the "same powers and duties" as the original Trustors of the Family Trust, which included the authority to "grant, sell, assign, convey, exchange, convert, manage, . . . invest, reinvest, loan, or reloan" trust property and to "borrow money for any trust purpose upon such terms and conditions as may be determined by the trustees, and to obligate the trust property for the repayment of money so borrowed." The trustees were also generally given "all powers that are necessary or convenient to make fully effective the purposes of the trust."

During his or her lifetime, the surviving trustor was entitled to the "entire net income" of the Residuary Trust as well as those sums from principal that the trustees "may deem necessary for the reasonable support, care, and maintenance of the surviving trustor." Upon the death of the surviving trustor, the assets of the Residuary Trust were to be divided equally among Jean's three children, if then living. If any child was not then alive, that child's share was to be distributed to the child's issue "by right of representation." If no issue of that child was then living, the child's share was to be divided between the other children's shares.

## 2. The No Contest Clause

The Family Trust included a no contest provision (No Contest Clause). Among other things, the No Contest Clause provided that any beneficiary who attacked "any of the provisions of this declaration of trust" or sought to "impair any of the provisions of . . . this declaration of trust" would take nothing "from either of the trustors' estates or any trust created by this declaration of trust."

4

### 3.    Subsequent Estate Planning

Erin died in 1995.  Under the terms of the Family Trust, upon his death the Residuary Trust was funded and became irrevocable.

William died in 2006 without any issue.  William's share of the Residuary Trust therefore was to be split between Joan's and Robert's share.

After Erin's death, Jean and Robert became the trustees of the Residuary Trust, which was initially funded with about $16 million in assets.  Jean and Robert established a complex financial structure using the assets of the Residuary Trust that Robert claims was for the purpose of avoiding estate taxes and Dae claims was designed to disinherit him.  Only the broad outlines of this structure are necessary to decide the issues on appeal, and we therefore summarize it only generally.

In 2011, Jean and Robert set up two trusts, reflecting the two remaining children's interests in the Residuary Trust—the 2011 Gibb Trust (Gibb was Joan's last name) and the 2011 Traver Trust (collectively, the 2011 Trusts).  Using a loan from the Royal Bank of Canada secured by the Residuary Trust's assets, Robert and Jean purchased life insurance on the lives of Joan and Robert by paying a premium of $7.5 million for each policy.  The policies initially provided death benefits of $16.2 million for Joan and $15.2 million for Robert.  The 2011 Gibb Trust owned the policy on Joan's life, and the 2011 Traver Trust owned the policy on Robert's life.

In what Robert calls a "split dollar" arrangement, a series of agreements gave the Residuary Trust an interest in the life insurance policies in return for the Residuary Trust's financing of

the premiums for those policies.[4]  The Residuary Trust's interest (the Receivables) was equal to the greater of:  (1) the amount of the premiums, or (2) the cash value of the policies at the time of the insured's death.

Jean and Robert later established two other trusts—the 2014 Gibb Trust and the 2014 Traver Trust (collectively, the 2014 Trusts).  Those two trusts purchased the Receivables from the Residuary Trust for the sums of $674,900 (by the 2014 Gibb Trust) and $626,400 (by the 2014 Traver Trust).  With the approval of a "trust protector" for the 2011 trusts, the 2014 Gibb Trust and the 2014 Traver Trust also acquired the assets of the 2011 Gibb Trust and the 2011 Traver Trust, respectively.  The net effect of these transactions was to provide the 2014 Trusts with the bulk of the assets of the Residuary Trust.

Under the original terms of the 2014 Gibb Trust, Joan was the lifetime beneficiary and her issue (i.e., Dae) was the remainder beneficiary.  However, the terms of the trust gave Joan a power of appointment to designate the remainder

---

[4] A "split-dollar" life insurance arrangement has been described as "any arrangement between an owner and a nonowner of a life insurance contract, where either party pays any portion of the premiums (including payment by means of a loan secured by the life insurance contract) and at least one of the parties is entitled to recover, either conditionally or unconditionally, all or any portion of those premiums (and recovery is to be made from or secured by proceeds from the life insurance contract)."  (*Estate of Cahill v. Comm'r* (2018) 115 T.C.M. (CCH) 1463 [T.C. Memo 2018-84 at p. *12, 2018 Tax Ct. Memo LEXIS 86 at p. **11].)  We refer to the financial arrangement involving the Residuary Trust assets as the "Split Dollar Trust Arrangement."

beneficiaries. On August 5, 2015, Joan exercised that power, directing the assets of the 2014 Gibb Trust to various charities and to Robert and his children rather than to Dae.

Robert testified that the purpose of the Split Dollar Trust Arrangement was to minimize estate taxes and that it accomplished that goal. He also testified that he and Jean set up the arrangement with the advice and counsel of financial and legal advisors.

Joan died on July 12, 2016. Jean died three months later, on October 15, 2106.

## 4. Probate Court Proceedings

In October 2018, Dae filed a verified petition to "settle the accounts," to "confirm trust assets and trust debts," and to "compel redress of a breach of trust and to compel the trustee to provide information regarding the trust administration." Dae filed a supplemental verified petition in March 2019. (We refer to both petitions collectively as Dae's Petition.)

Dae's Petition (described in more detail below) alleged that Robert breached his fiduciary duties to the Family Trust by engaging in the transactions underlying the Split Dollar Trust Arrangement and by using Residuary Trust assets to benefit himself and his family while depriving Dae of his interest in the trust.

Robert filed responses and objections to Dae's initial petition and to the supplemental petition. On June 10, 2019, Robert also filed his own petition "for order and instructions regarding [Dae's] violations of no contest clauses" (No Contest Petition). The No Contest Petition sought a declaration that Dae's Petition constituted a "contest" in violation of the Family

7

Trust's No Contest Clause, and requested a ruling deeming all of Dae's interest in the Family Trust to be forfeited.

Dae responded to that petition with his anti-SLAPP motion, which sought an order striking the entire No Contest Petition. The motion alleged that the No Contest Petition sought to impose liability on Dae as a result of Dae's protected petitioning activity. The motion also alleged that Robert "cannot meet his resulting burden of demonstrating a likelihood of success on the merits of his [No Contest] Petition because . . . Dae's Petition only challenges certain acts of borrowing and trust administration by [Robert], which had the effect of changing the beneficiaries of the irrevocable Residuary Trust, enriching [Robert] at the expense of . . . Dae." Robert filed an opposition, which included his own declaration.

The probate court denied the motion. The court observed that, even under the "minimal merit" standard applicable to anti-SLAPP motions, "the arguments and evidence presented by the parties calls into question the propriety of the various Residuary Trust transactions at issue." The court noted that Joan's beneficial interest in the Residuary Trust "was contingent on her not predeceasing Jean," and "[o]therwise, Joan's interest was to go to [Dae]." The court also noted that "[t]here does not appear to be any provision in the Family Trust allowing Joan to alter beneficiaries of the irrevocable Residuary Trust."

However, the probate court also noted Robert's testimony that "all these transactions were done at 'arms-length' under the guidance of financial advisers and independent appraisers." The court concluded that, "when this aspect is considered with the intention of reducing tax liability and expenses . . . , it is possibly conceivable that Robert and Joan's actions were within their

8

discretion as trustees as outlined by the Family Trust.  In turn, [Dae's] petition challenging these actions would contest their powers under the Family Trust."  The court therefore ruled that "Robert has shown enough, for purposes of this Motion, to show the 'minimal merit' required to survive an anti-SLAPP motion."

## DISCUSSION

**1.    The Anti-SLAPP Procedure**

Analysis of an anti-SLAPP motion is a two-step process.  In the first step, "the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*).)  At this stage, the defendant must make a "threshold showing" that the challenged claims arise from protected activity, which is defined in Code of Civil Procedure section 425.16, subdivision (e).  (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.)

Second, if the defendant makes such a showing, the "burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral*, 1 Cal.5th at p. 396.)  Without resolving evidentiary conflicts, the court determines "whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment." (*Ibid*.)  The plaintiff's showing must be based upon admissible evidence. (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.)  Thus, the second step of the anti-SLAPP analysis is a "summary-judgment-like procedure at an early stage of the litigation." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)  In this step, a plaintiff "need only establish that his or her claim has 'minimal merit' [citation] to avoid being

9

stricken as a SLAPP." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291, quoting *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) A plaintiff prevails in the second step by demonstrating that " 'the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821, quoting *Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 548.)

Here, the parties agree that Robert's No Contest Petition arose from Dae's protected litigation conduct under the first step of the anti-SLAPP analysis. Thus, we need consider only whether Robert provided sufficient evidence to show a likelihood of success on his No Contest Petition in the second step of the anti-SLAPP procedure. In doing so, we employ a de novo standard of review. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.)

**2. The Law Concerning No Contest Provisions**

No contest clauses respect the intent of a donor by "discouraging litigation by persons whose expectations are frustrated by the donative scheme of the instrument." (*Donkin v. Donkin* (2013) 58 Cal.4th 412, 422 (*Donkin*).) However, that interest is in tension with the policy of "avoiding forfeitures and promoting full access of the courts to all relevant information concerning the validity and effect of a will, trust, or other instrument." (*Ibid.*)

The common law of California traditionally balanced these interests by enforcing no contest clauses so long as they were " 'not prohibited by some law or opposed to public policy.' " (*Donkin, supra,* 58 Cal.4th at p. 422, quoting *In re Estate of*

10

*Kitchen* (1923) 192 Cal. 384, 388.)  No contest clauses were also strictly construed.  (*Kitchen*, at pp. 389–390.)

The Legislature began codifying the law concerning no contest clauses in 1989.  (*Donkin, supra,* 58 Cal.4th at p. 422.)  The general rule was that, unless a statute provided otherwise, "a no contest clause is enforceable against a beneficiary who brings a contest within the terms of the no contest clause." (Former Prob. Code, § 21303, added by Stats. 1989, ch. 544, § 19, p. 1825, and repealed by Stats. 1990, ch. 79, § 13, p. 463, operative July 1, 1991.)[5]  However, the Legislature also explained that the statutes governing no contest provisions were "not intended as a complete codification of the law governing enforcement of a no contest clause" and that the "common law governs enforcement of a no contest clause to the extent this part does not apply."  (Former § 21301.)

The statutory scheme thereafter became increasingly complex as the Legislature added amendments identifying particular types of actions "against which a no contest clause was not enforceable."  (*Donkin, supra,* 58 Cal.4th at p. 423.)  In 2008 the Legislature simplified the statutory scheme (effective in 2010) "by more narrowly defining the types of challenges that *could* be subject to a no contest clause."  (*Key v. Tyler* (2019) 34 Cal.App.5th 505, 516 (*Key*).)  "Under current law, a no contest clause is enforceable against a 'direct contest that is brought

---

[5] Subsequent undesignated statutory references are to the Probate Code.  Because this case involves the application of prior law, we hereafter identify statutory provisions that have since been repealed or amended by referring to them simply as "former" statutes without including detailed information about their effective dates.

without probable cause.' " (*Id.* at p. 517, quoting § 21311, subd. (a)(1).)

The Residuary Trust became irrevocable in 1995 when Erin died. Thus, the parties agree that the no contest law prior to 2010 applies here. (See § 21315.)

**3.    Robert Met His Burden to Show that His No Contest Petition Has "Minimal Merit"**

   **A.    *Dae's Petition broadly challenged the trustees' conduct***

Dae argues that his Petition does not challenge the terms of the Family Trust. He agrees that Robert, "as trustee, had broad powers to enter into transactions concerning the [Family] Trust's assets." Dae claims that his Petition "merely challenges the manner in which [Robert] has used those powers to take [Dae's] inheritance for himself."

Dae's filings in the probate court suggest otherwise. Rather than simply targeting the specific act that decreased his inheritance—i.e., Joan's exercise of her power of appointment to exclude Dae as a beneficiary of the 2014 Gibb Trust—Dae's Petition took aim at the trustee's entire Split Dollar Trust Arrangement.

Dae's Petition specifically challenged his removal as a beneficiary of the trusts that Jean established for the life insurance proceeds (which Dae's Petition called the "irrevocable life insurance trust or trusts" or " 'ILITS' "). Dae alleged that he "could have easily been made a proportionate beneficiary under the ILITS but was intentionally not made so by [Robert] and [Robert's family] and others designing the ILITS that put [Robert] in a breach of his fiduciary duties owed under the Residuary Trust to [Dae] as a beneficiary."

However, Dae's Petition also went further in alleging that the trustees' decision to purchase the insurance policies on the lives of Joan and Robert in the first place was outside their authority. Dae's Petition characterized Jean's interest in the Residuary Trust as a "life estate of the income and a limited right to invade principal," which was treated for tax purposes as "Qualified Terminal Interest Property." Dae's Petition then discussed the facts concerning the $15 million loan from the Royal Bank to pay the premiums on the insurance policies for Joan and Robert and asked, "Why would the Residuary Trust spend $15,000,000 in carrying out its purpose as a Qualified Terminal Interest Property (hereinafter the 'QTIP') Trust?" Dae's Petition answered this question by alleging that "all the payments made by the Residuary Trust related to the $15,000,000 borrowing from Royal Bank were really related to the personal activity of Jean Walsh and not for carrying out the purpose of the QTIP."

Dae's Petition also challenged the trustee's authority to transfer the Receivables from the Residuary Trust to the 2014 Gibb Trust and the 2014 Traver Trust. Dae's Petition alleged that the Residuary Trust received inadequate consideration for that transfer and claimed that the transaction "was just a shifting of what is really a loss by Jean . . . and her Survivor's Trust to the Residuary Trust." Dae claimed that the "payment of interest costs and all of the other related costs" associated with the Royal Bank loan should be "payable to the Residuary Trust" from the Survivor's Trust.

It is undisputed that the Split Dollar Trust Arrangement, including the purchase of insurance on Joan's life through the loan from the Royal Bank, resulted in a payment of $16.2 million

13

to the 2014 Gibb Trust after Joan's death.  Thus, in return for a policy payment of $7.5 million, the 2014 Gibb Trust received more than twice that amount free of federal estate tax.  Had Joan not excluded Dae as a beneficiary of the 2014 Gibb Trust, Dae would have received the substantial benefit of this arrangement.

By attacking the trustees' decision to establish the Split Dollar Trust Arrangement, Dae's Petition appears to challenge their authority to manage the principal of the Residuary Trust for the benefit of the trust beneficiaries.  As mentioned, the Family Trust gave the trustees the authority to invest, loan, convey, and hypothecate trust property.  Thus, Dae's Petition arguably sought to "impair" trust provisions which expressly granted powers that the trustees exercised in setting up the Split Dollar Trust Arrangement.

A challenge to investment decisions that a trust expressly empowers a trustee to make can amount to a contest.  In *Hearst v. Ganzi* (2006) 145 Cal.App.4th 1195 (*Hearst*), income beneficiaries of a trust sought a ruling that their proposed petition would not violate the trust's no contest clause.[6]  The petition alleged that the trustees breached their fiduciary duties by decisions that reduced the dividends the income beneficiaries received.  The probate court concluded that the proposed petition

---

[6] The beneficiaries made their request under a former statute establishing a "safe harbor" proceeding to obtain a ruling declaring whether a particular petition would violate an instrument's no contest clause before that petition was actually filed.  (*Hearst, supra,* 145 Cal.App.4th at p. 1202; see former section 21320; *Funsten v. Wells Fargo Bank, N.A.* (2016) 2 Cal.App.5th 959, 974 [safe harbor procedure no longer available after statutory revisions in 2010].)

14

would violate the trust's no contest clause, and the Court of Appeal affirmed. (*Id.* at pp. 1199–1200.)

The trust instrument in *Hearst* provided the trustees with the authority to hold assets regardless of the income they produced and to decide what was income and what was the principal of the trust. (*Hearst, supra,* 145 Cal.App.4th at pp. 1201–1202.) The trustees were also given explicit authority to treat income and remainder beneficiaries differently. (*Id.* at p. 1214.) The Court of Appeal held that the income beneficiaries' attempt to increase their dividends would contest the provisions of the trust by interfering with the trustee's business decisions and their discretion to decide what was income and what was principal. (*Id.* at pp. 1210–1212.)

Dae's Petition similarly seeks to limit the discretion of the Family Trust's trustees by challenging their use of trust assets to purchase life insurance and to fund other trusts with the proceeds. It is undisputed that the Split Dollar Trust Arrangement avoided estate taxes, which was within the scope of the trustee's authority.

Dae cannot avoid the consequences of his broad challenge to the trustee's discretion by belatedly narrowing his focus only to the specific conduct that directly resulted in his loss of a beneficiary interest. The purpose of no contest clauses is to discourage litigation that challenges the intent of the donor. (*Donkin, supra,* 58 Cal.4th at p. 422.) A pleading that initiates such litigation can violate a no contest clause even if its allegations are later withdrawn.

For example, in *Schwartz v. Schwartz* (2008) 167 Cal.App.4th 733, the court held that a petition seeking a particular distribution from an inter vivos trust violated a no

15

contest clause even though the petitioner withdrew the petition several months later.  The court reasoned that the petitioner "used the mechanisms of the court" to challenge the decedent's intent, compelling the respondent to respond and the court to hold hearings.  (*Id.* at p. 745.)  The court concluded that permitting the petitioner to "escape the consequences" of his petition by withdrawing the contest would defeat the purpose of the no contest clause.  (*Ibid*.)[7]

Here, Dae's Petition initiated litigation, causing Robert to file responses and to file his separate No Contest Petition.  The No Contest Petition in turn spawned proceedings on Dae's anti-SLAPP motion.  Dae may not now escape the consequences of his original allegations by recasting his Petition as a narrow challenge only to the particular actions that removed him as a beneficiary of the 2014 Gibb Trust.

**B.** ***Robert provided sufficient evidence showing that Dae's challenge to his own disinheritance was a contest***

Based upon the current record, it is also possible that Dae's specific challenge to his removal as a beneficiary of the 2014 Gibb

---

[7] Under current law a " 'Contest' " is triggered by "a pleading filed with the court by a beneficiary."  (§ 21310, subd. (a).)  In discussing the proposed 2008 changes to the no contest statutes, the California Law Revision Commission explained that a contest was defined this way because "[m]any of the harms that can result from litigation occur early in a contest (e.g., reputational harm to the transferor or beneficiaries, acrimony between beneficiaries, and pressure to settle with a dissatisfied beneficiary)."  (Recommendation:  Revision of No Contest Clause Statute (Jan. 2008) 37 Cal. Law Revision Com. Rep. (2007) p. 391.)

Trust would subvert the Trustors' intent. One of the two original Trustors of the Family Trust—Jean—established the 2014 Gibb Trust, which included the provision giving Jean's daughter Joan the power to appoint the persons who would receive the assets of that trust upon Joan's death. It is that provision that permitted Joan to exclude Dae from the remainder beneficiaries who would inherit those assets. Thus, Jean was a key participant in the conduct that allegedly led to Dae's disinheritance.

In his declaration, Robert testified that, following Erin's death, "Jean occasionally expressed to me a desire to engage in additional estate planning activities in order to further the purposes of the Family Trust to pass as much of her estate to her children as possible and minimize estate taxes." Robert also testified that, "[a]s Erin had no children, the goal of the Family Trust was to ensure that the Walsh Estate would pass efficiently to *Jean's* children with minimal estate tax impact."

The provisions of the Family Trust also suggest that the primary goal of that trust was to leave as much money as possible to Jean's *children*. The Family Trust designated the surviving trustor (i.e., Jean) as an income beneficiary of the Residuary Trust, with the Residuary Trust property to be distributed to Jean's three children in equal shares upon the surviving trustor's death. Only if one or more of those children predeceased the surviving trustor was the property of the Residuary Trust to be distributed to the deceased child's issue "by right of representation."

Thus, under the original terms of the Family Trust, if Joan had outlived Jean (instead of dying three months earlier, as actually happened), Joan would have inherited her portion of the Residuary Trust property and would have been free to do with

17

that property what she wanted—including giving it away or bequeathing it to persons other than Dae. It is highly conceivable that, in executing the Family Trust, Erin and Jean expected that Jean's children would outlive them and therefore would be free to dispose of their Residuary Trust property as they wished once they inherited it. The provision for inheritance by right of representation in the event a child predeceased the surviving Trustor could simply have reflected an intent to maintain equal treatment of all of Jean's children and their families rather than specifically to provide a benefit to the Trustor's grandchildren from the Residuary Trust.[8] If the Trustors had intended to ensure a benefit to the grandchildren from that trust, they could have included provisions in the trust instrument guaranteeing the grandchildren's inheritance regardless of when the grandchildren's parents died.[9]

---

[8] As mentioned, the grandchildren already were guaranteed some inheritance through the generation skipping trust.

[9] Of course, as the trial court pointed out, under the express terms of the trust instrument Dae's interest became fixed once his mother Joan died before Jean. The Trustors could have included a provision permitting Joan (and Jean's other children) to designate the beneficiaries of their portion of the Residuary Trust property in the event that they predeceased the surviving Trustor, but they did not do so. We do not purport to reach any ultimate resolution of these issues concerning the Trustors' intent, which may depend upon extrinsic evidence. On this appeal from an anti-SLAPP motion, we decide only that Robert has made the minimal showing necessary to support his claim that Dae's Petition amounted to a contest.

18

This evidence supports a reasonable inference that the Trustors expected, and intended, the property of the Residuary Trust to pass to Jean's children to use and distribute as they chose. If that inference is credited (as we must do in ruling on an anti-SLAPP motion), Jean's conduct in establishing a trust giving Joan the power to appoint beneficiaries, and Jean's and Robert's conduct in permitting the transfer of the Residuary Trust's assets into that trust, may have been fully in accord with the Trustors' original intent. Accordingly, Dae's Petition challenging that conduct could amount to a contest.

We emphasize that we do not now decide that Dae's Petition amounted to a "contest" for purposes of the No Contest Clause. Whether there has been a contest within the meaning of a particular no contest clause depends upon the individual circumstances of the case and the language of the particular instrument. (*Burch v. George* (1994) 7 Cal.4th 246, 254–255.) " '[T]he answer cannot be sought in a vacuum, but must be gleaned from a consideration of the purposes that the [testator] sought to attain' " by the instrument in question. (*Id.* at p. 255, quoting *Estate of Kazian* (1976) 59 Cal.App.3d 797, 802.) Extrinsic evidence may exist that bears upon the proper interpretation of the trusts here, including evidence of the Trustors' intent. (See *Burch*, at p. 254 [the interpretation of trust language is a question of law "unless interpretation turns on the credibility of extrinsic evidence or a conflict therein"].) On this appeal, we decide only that Robert has provided sufficient evidence that there was a contest to defeat Dae's anti-SLAPP motion. We leave for the trial court to consider the merits of Robert's no contest claim at a hearing on a fully developed record following discovery.

19

**C.** ***The evidence is sufficient for Robert to proceed on a claim that Dae's Petition was frivolous***

Citing *Estate of Ferber* (1998) 66 Cal.App.4th 244 (*Ferber*), Dae argues that to establish that the breach of fiduciary duty claims in Dae's Petition triggered the No Contest Clause, Robert will need to prove that those claims were frivolous.[10] Dae further argues that this burden must be taken into consideration in determining whether Robert has demonstrated the minimal merit necessary to proceed on his No Contest Petition.

In *Ferber,* the court considered a no contest provision in a will that purported to disinherit any beneficiary who "objects in any manner to any action taken or proposed to be taken" by the executor or "unsuccessfully requests the removal of any person acting as an executor." (*Ferber, supra,* 66 Cal.App.4th at p. 248.) A beneficiary sought a ruling under the safe harbor provision of the prior law that objections to an accounting and a petition to remove the executor would not violate the no contest clause. (*Id.* at pp. 248–249.) The court held that those claims would violate the no contest clause, but that the clause was unenforceable to the extent it purported to punish the beneficiary's nonfrivolous breach of fiduciary claims. (*Id.* at pp. 250, 255.) The court concluded that this standard struck an appropriate balance between the competing public policies of permitting beneficiaries

---

[10] *Ferber* was decided prior to legislative changes to the no contest statutes in 2001, and prior to the Legislature's major revisions to the no contest law in 2010 discussed above. The parties agree that *Ferber* was decided under the law that is applicable to this case.

20

to challenge fiduciary malfeasance and discouraging litigation that challenges a testator's intent.  (*Id.* at pp. 254–255.)

Robert argues that the frivolousness standard the court adopted in *Ferber* does not apply to the claims that Dae asserts. Robert argues that *Ferber* is distinguishable because the court in that case considered the enforceability of a no contest clause that was overbroad in purporting to prohibit *any* claim challenging fiduciary conduct.  Robert points out that, in this case, Dae has never claimed that the No Contest Clause is unenforceable.

This ground for distinguishing *Ferber* is unpersuasive.  The policy considerations that the court considered in *Ferber* reach more broadly than Robert suggests.  The competing policies of discouraging litigation challenging a testator's intent and permitting beneficiaries to remedy fiduciary misconduct are at play whenever a no contest provision is interpreted to punish a particular fiduciary duty claim.  Under the court's reasoning in *Ferber,* a no contest clause is overbroad whenever it imposes a forfeiture for bringing a claim that should be permitted as a matter of public policy.  If the No Contest Clause in this case is interpreted to penalize a fiduciary duty claim that public policy would permit Dae to raise, it would be overbroad under the court's reasoning in *Ferber.*

There are other persuasive reasons to follow *Ferber* here. First, subsequent cases have adopted *Ferber's* reasoning.  (See *Fazzi v. Klein* (2010) 190 Cal.App.4th 1280, 1289 (*Fazzi*) [following *Ferber* in concluding that a no contest clause could not apply to a nonfrivolous action to remove a trustee for cause]; *Tunstall v. Wells* (2006) 144 Cal.App.4th 554, 561 [citing *Ferber* for the proposition that " '[b]eneficiaries must be free to raise public policy issues so the court may address them' "], quoting

21

*Ferber, supra,* 66 Cal.App.4th at p. 252; *Hearst, supra,* 145 Cal.App.4th at p. 1213 [citing *Ferber* at p. 253 for the proposition that "[n]o contest clauses that purport to insulate executors completely from vigilant beneficiaries violate the public policy behind court supervision"].)

Second, subsequent legislative actions validated *Ferber's* concern for protecting fiduciary duty claims from the threat of forfeiture. Following the decision in *Ferber*, "the Legislature went one step further and banned the enforcement of a no contest clause against *any* action to remove a fiduciary." (*Fazzi, supra,* 190 Cal.App.4th at p. 1289, fn. 5.) It did so by adopting former section 21305. Former section 21305, subdivision (b), among other changes, declared that a pleading " '(6) . . . challenging the exercise of fiduciary power' " does not violate a no contest clause " 'as a matter of public policy.' " (*Ibid.*; former § 21305, subd. (b).) That statute applied only to instruments that became irrevocable on or after January 1, 2001, and therefore does not directly apply here. (*Ibid.*; former § 21305, subd. (d); *Hermanson v. Hermanson* (2003) 108 Cal.App.4th 441, 445.) However, the legislative change was based on a public policy to permit claims of fiduciary misconduct that challenge a trustee's failure to carry out the terms of a trust. (See *Donkin, supra,* 58 Cal.4th at pp. 436–438.) In making that change, the Legislature concluded that this public policy was significant enough to establish broad protection for fiduciary duty claims despite a no contest clause.

Finally, Dae's Petition is based on the theory that Robert engaged in self-dealing. It challenges Robert's alleged conduct in permitting, or arranging, the transfer of Residuary Trust assets into the 2014 Gibb Trust for the purpose of allowing Joan to give Robert's children a portion of the inheritance that otherwise

would have gone to Dae.  If true, this conduct could constitute a violation of Robert's duty "not to use or deal with trust property for the trustee's own profit or for any other purpose unconnected with the trust, nor to take part in any transaction in which the trustee has an interest adverse to the beneficiary."  (§ 16004, subd. (a).)  That would be malfeasance of a kind that concerned the court in *Ferber*.

Thus, we agree with Dae that, for Robert to prevail on his No Contest Petition, Robert will ultimately need to prove both that Dae's Petition was a contest under the No Contest Clause *and* that at least one of the claims in Dae's Petition was frivolous.[11]

However, Robert need not prove that claim now.  Robert's burden in responding to Dae's anti-SLAPP motion was not to prove all the elements of his claim, but only to show that his No Contest Petition has "minimal merit."  This means that Robert need only provide evidence that, if credited, is sufficient to show that one or more of the challenges in Dae's Petition is frivolous.

---

[11] The analysis of whether a petition violates a no contest clause may differ by claim.  (See *Fazzi, supra,* 190 Cal.App.4th at pp. 1288–1289 [separately analyzing claims in a petition seeking to remove a trustee and to disqualify a successor trustee].)  As discussed above, Dae's Petition contains numerous allegations and different claims, including at least the claims that (1) the $15 million obligation of the Residuary Trust incurred to purchase the life insurance policies was an improper personal expense and should be repaid by Robert or the Survivor's Trust; (2) the 2014 Trusts paid inadequate consideration to acquire the Receivables from the Residuary Trust; and (3) Robert breached his fiduciary duties by orchestrating the funding of the 2014 Gibb Trust to benefit his family at Dae's expense.

(Cf. *Key, supra,* 34 Cal.App.5th at pp. 531–539 [to prevail in the second step of an anti-SLAPP motion, proponent of a no contest petition was required to provide sufficient evidence showing that the respondent contested a trust without probable cause].) Robert has made such a showing.

As discussed above, Robert provided evidence that, with expert advice and counsel, he and Jean established the Split Dollar Trust Arrangement for the purpose of minimizing estate taxes to increase the assets available to beneficiaries. If this is true, Dae's broad challenge to the Split Dollar Trust Arrangement would clearly implicate the No Contest Clause by "impair[ing]" the administration of the Trust. That would be sufficient for Robert to succeed on his No Contest Petition, causing forfeiture of Dae's beneficial interest. Robert has therefore shown a probability of success on his No Contest Petition sufficient to meet the "minimal merit" test.[12]

---

[12] At this stage of the proceedings, we also cannot foreclose the possibility that Robert might ultimately prove Dae's more specific challenge to his own removal as a beneficiary is frivolous. As discussed above, that challenge is predicated on Robert's conduct in permitting the establishment and funding of the 2014 Gibb Trust that enabled Joan to direct the disposition of her share of the Residuary Trust before Joan had actually received that share. Whether that conduct was consistent with the terms of the Family Trust depends upon the Trustors' intent with respect to Jean's children and grandchildren, which in turn may depend upon extrinsic evidence. While the current record does not show that Dae's challenge to his own disinheritance was frivolous, evidence might develop that would make the continued pursuit of that theory unreasonable.

24

**DISPOSITION**

The trial court's order is affirmed.  Respondent Robert Traver is entitled to his costs on appeal.

CERTIFIED FOR PUBLICATION.



LUI, P. J.

I concur:



CHAVEZ, J.

*Dae v. Traver,* B305834

ASHMANN-GERST, J., Dissenting.

I conclude that the trial court should have granted the anti-SLAPP motion[1] filed by Ian C. Dae (Dae) to strike the no contest petition filed by Robert Traver (Robert)[2] in his capacity as trustee of the Erin J. Walsh and Jean L. Walsh Family Trust (Family Trust) because he failed to demonstrate a probability of prevailing on his claims.

The majority, in contrast, concludes that Robert submitted sufficient evidence to suggest that Dae filed a contest because: (1) it is conceivable that he never had an irrevocable remainder interest in the Residuary Trust; (2) the cotrustees had the power to purchase the life insurance policies and transfer the receivables to the 2014 Gibb Trust and the 2014 Traver Trust as part of their estate planning; and (3) by contesting his de facto disinheritance from the Residuary Trust and the cotrustees' estate planning decisions, Dae is contesting the terms of the

---

[1] The anti-SLAPP statute provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition . . . shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (Code Civ. Proc., § 425.16, subd. (b).) "SLAPP" is an acronym for "strategic lawsuit against public participation." (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 785, fn. 1.)

[2] Because multiple people connected to the Family Trust share various last names, we refer to some by their first names. No disrespect is intended.

Family Trust and the powers of the cotrustees. Also, the majority concludes that the evidence suggests that Dae's claims are frivolous.

For the reasons discussed below, I disagree.

## I. Dae had an Irrevocable Remainder Interest in the Residuary Trust.

Whether Dae had an irrevocable remainder interest in the Residuary Trust requires interpretation of its terms.

Interpretation of a trust presents a question of law unless it turns on the competence or credibility of extrinsic evidence, or on a conflict in that evidence. (*Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 73 (*Ike*).) The intent of the trustor controls. (*Ibid.*) "[I]t is proper for the trial court in the first instance and the appellate court on de novo review to consider the circumstances under which the document was made so that the court may be placed in the position of the testator or trustor whose language it is interpreting, in order to determine whether the terms of the document are clear and definite, or ambiguous in some respect." (*Ibid.*) "An ambiguity in a written instrument exists when, in light of the circumstances surrounding the execution of the instrument, '"the written language is fairly susceptible of two or more constructions." [Citations.]' [Citation.]" (*Id.* at p. 74.) "Where a trust instrument contains some expression of the trustor's intention, but as a result of a drafting error that expression is made ambiguous, a trial court may admit and consider extrinsic evidence . . . to resolve the ambiguity and give effect to the trustor's intention as expressed in the trust instrument. [Citation.]" (*Ibid.*)

The Family Trust specified: "After the death of one of the trustors, The Grandchildrens' Trusts[] and The Residuary Trust

2

in each case shall be irrevocable and the surviving trustor shall not have the right to make additions to said trusts, or the right to change, alter, modify, or revoke said trusts in any manner whatsoever." The Residuary Trust established that "[d]uring the lifetime of the surviving trustor, the trustees shall pay to, or for the benefit of, the surviving trustor, the entire net income of The Residuary Trust." It also provided that "[u]pon the death of the surviving trustor, the trust property shall be divided into three equal shares which shall be distributed as follows: [¶] . . . [¶] [3] One share shall be distributed to Joan Traver Dae [(Joan)] if she [is] then [] living. If [Joan] is not then living, said share shall be distributed to her issue by right of representation."

The trust terms are unambiguous. As Joan's son, Dae had an irrevocable remainder interest in her share of the Residuary Trust if she predeceased Jean L. Walsh (Jean). It is impossible to read the trust as allowing Joan to decide that her share should be distributed to some other person or persons.

The majority suggests that the trust terms are ambiguous and could be construed as permitting Jean's children to disinherit their issue when viewed through the lens of the following extrinsic evidence: "One of the two original Trustors of the Family Trust—Jean—established the 2014 Gibb Trust, which included the provision giving Jean's daughter Joan the power to appoint the persons who would receive the assets of that trust upon Joan's death." (Maj. Opn., at p. 17.) Robert declared that "[a]s Erin [J. Walsh (Erin)] had no children, the goal of the Family Trust was to ensure that the Walsh Estate would pass efficiently to *Jean's* children[.]" (*Ibid.*) "The Family Trust designated the surviving trustor (i.e., Jean) as an income beneficiary of the Residuary Trust, with the Residuary Trust

3

property to be distributed to Jean's three children in equal shares upon the surviving trustor's death.  Only if one or more of those children predeceased the surviving trustor was the property of the Residuary Trust to be distributed to the deceased child's issue 'by right of representation.'" (*Ibid.*)  "[U]nder the original terms of the Family Trust, if Joan had outlived Jean (instead of dying three months earlier, as actually happened), Joan would have inherited her portion of the Residuary Trust property and would have been free to do with that property what she wanted— including giving it away or bequeathing it to persons other than Dae." (Maj. Opn., at pp. 17–18.)

The majority concludes that the "provisions of the Family Trust . . . suggest that the primary goal of that trust was to leave as much money as possible to Jean's *children.*" (Maj. Opn., at p. 17.)  It also concludes that "[t]he provision for inheritance by right of representation in the event a child predeceased the surviving Trustor could simply have reflected an intent to maintain equal treatment of all of Jean's children and their families rather than specifically to provide a benefit to the Trustor's grandchildren from the Residuary Trust.  If the Trustors had intended to ensure a benefit to the grandchildren from that trust, they could have included provisions in the trust instrument guaranteeing the grandchildren's inheritance regardless of when the grandchildren's parents died." (Maj. Opn., at p. 18, fns. omitted.)  Per the majority, "This evidence supports a reasonable inference that the Trustors expected, and intended, the property of the Residuary Trust to pass to Jean's children to use and distribute as they chose.  If that inference is credited . . . , Jean's conduct in establishing a trust giving Joan the power to appoint beneficiaries, and Jean's and Robert's conduct in

4

permitting the transfer of the Residuary Trust's assets into that trust, may have been fully in accord with the Trustors' original intent. Accordingly, Dae's Petition challenging that conduct could amount to a contest." (Maj. Opn., at p. 19.)

The problem with this analysis is that none of the evidence suggests that the phrase "said share shall be distributed to [Joan's] issue by right of representation" contains words used by the trustors in a specialized way. For example, there is no evidence that the word "shall" was intended to mean may, or that the word "issue" was intended to mean any person of Joan's choosing. (*Estate of Dye* (2001) 92 Cal.App.4th 966, 977 [evidence did not create an ambiguity in a will because it failed "to raise a semantically plausible alternative candidate of meaning"].) I therefore decline to interpret the language "shall be distributed to [Joan's] issue" as meaning "shall be distributed as Joan specifies."

The majority suggests that we can interpret the Family Trust by looking at the primary goal of the trustors and their presumption about who would outlive who. I cannot concur. The court in *Estate of Canfield* (1967) 256 Cal.App.2d 647, 654 explained—in the context of a will—that "[t]he fact that fate, as it often does, thereafter proved [a] decedent to have been mistaken in [assuming who would outlive who] does not authorize a trial or appellate court to rewrite a will under the guise of construing it to determine what the testator *might* have intended if he had survived to a later date and had written it in the light of subsequent developments." (*Ibid.*) This observation applies with equal force here.

Ultimately, the underpinning of the majority's holding is found in its summation. "Robert provided sufficient evidence of

5

the trustor's intent to allow a change of beneficiary," this "conclusion is limited to the context in which it arises—an anti-SLAPP motion," and the majority expresses "no opinion on how the probate court should ultimately rule on Robert's petition." (Maj. Opn., at p. 3.) Once this summation is unpacked, several significant points are revealed. The majority does not apply the rules of document interpretation to conclude that the language of the trust is reasonably susceptible to the interpretation that the remainder beneficiaries could be changed. Rather, it concludes that the evidence of the trustors' intent offered by Robert was enough, by itself, to prove the potential meaning of the trust in the anti-SLAPP context. The implications thereby endorsed by the majority are: The rules of document interpretation as applied to trusts are suspended and/or relaxed for parties who are resisting anti-SLAPP motions. Moreover, if a party resisting an anti-SLAPP motion has an opinion regarding the meaning of a trust, that opinion must be accepted even if it is directly contrary to the plain language of the trust.

The language of the anti-SLAPP statute provides no room for the majority's interpretation. In *Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1537 (*Jay*), the defendants argued that when the statute states that "the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based" (Code Civ. Proc., § 425.16, subd. (b)(2)), it means that a court must "consider all evidence submitted." (*Jay, supra,* 218 Cal.App.4th at p. 1537.) In rejecting this argument, the court recognized that "the statute neither suggests nor states that normal rules of evidence and procedure do not apply to anti-SLAPP motions[.]" (*Ibid.*) I conclude that the normal rules of evidence and procedure were

6

applicable here, i.e., we must adhere to the rules of document interpretation related to trusts when deciding if Robert's petition had minimal merit. Allowing a defendant to survive an anti-SLAPP motion if he or she has not shown an ability to prevail on a later motion or at trial is directly contrary to the stated purpose of the anti-SLAPP statute: to allow special motions to strike meritless actions and thereby curb the effect of lawsuits "brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (Code Civ. Proc., § 425.16, subd. (a).)

To the degree the majority intimates that a court can modify the Family Trust, I see it differently.

A trial court has the equitable power to modify an irrevocable trust, but only in exceptional circumstances. (*Ike*, *supra*, 61 Cal.App.4th at pp. 79–82.) The modification must be necessary to accomplish the purpose of the trustors as expressed in the trust instrument. (*Id*. at p. 80; *Stewart v. Towse* (1988) 203 Cal.App.3d 425, 428.)

In *Adams v. Cook* (1940) 15 Cal.2d 352 (*Adams*), investors placed real property into a trust to be sold by a date certain at a fixed price. (*Id*. at pp. 354, 360.) Any lease of the property had to be subject to its sale. "It was the intent of the trustors that the unit holders or beneficiaries under the trust should secure the largest return on their investment." (*Id*. at p. 360.) After oil was discovered on the property, and after the oil was allegedly being drained by numerous wells drilled on adjacent property, the beneficiaries asked the probate court to allow the trustee to execute an oil lease free of the restrictions as to sale. The trial court granted the relief, finding that if the trustee could not execute an oil lease, the property would become worthless. Our

7

Supreme Court affirmed. (*Id*. at p. 363.) It noted that "a court of equity has the power to change the method of administering a trust estate[] when it is shown that such a change is necessary to prevent loss or destruction of the trust property[.]" (*Id*. at p. 358.) It explained that "the rule against courts modifying the terms of a contract . . . does not apply to declarations of trust, where the primary purpose of the trust would not be accomplished by a strict adherence to the terms of the declaration of trust[,] and that when it is made to appear in a court of equity . . . that the benefits and advantages which the trustors desired to confer upon the beneficiaries would not accrue to them by 'a slavish adherence to the terms of the trust,' the courts may modify the terms of the trust to accomplish the real intent and purpose of the trustors." (*Id*. at p. 361.)

"It is only under peculiar circumstances, such as those exemplified in [*Adams*], that a court has the power to modify an active trust. [Citations.]" (*Moxley v. Title Ins. & Trust Co.* (1946) 27 Cal.2d 457, 468.) One such circumstance is when a drafting error defeats the trustor's intentions. (*Bilafer v. Bilafer* (2008) 161 Cal.App.4th 363, 369.)

The case at bar does not present an exceptional or peculiar circumstance in which a court is empowered to modify the Residuary Trust. There is no expression in the Family Trust that Joan could decide to change whether her issue take her share under the Residuary Trust if she predeceased the survivor of Erin or Jean. There was no drafting error in the Family Trust. A modification is not necessary to preserve the value of the trust property, as in *Adams*. In any event, the point is moot because Robert did not file a petition asking the probate court to modify the Family Trust.

## II. Dae did not File a Contest.

Whether there has been a contest within the meaning of a no contest clause depends upon the circumstances and the language used. A court must consider the purposes that the trustor sought to obtain by the provisions of his or her trust. (*Estate of Strader* (2003) 107 Cal.App.4th 996, 1002–1003.) Consequently, a contest has been construed to mean an attempt to thwart a testator's intent. (*Burch v. George* (1994) 7 Cal.4th 246, 262–263.)

The intent of trustors—Erin and Jean—can be gleaned from the unambiguous terms of the Family Trust. They intended for Jean's issue to receive her share of the Residuary Trust if she predeceased the surviving trustor. Dae's petition is designed to enforce that intent, an intent that was thwarted when Jean and Robert breached their fiduciary duty to Dae by removing a large percentage of the assets from the Residuary Trust and placing the right to receive life insurance proceeds upon the death of Joan into a trust that failed to preserve Dae's irrevocable remainder interest.[3] The Family Trust never authorized the

---

[3] "Among the duties of the trustee is the duty to administer the trust and to manage trust property 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims to accomplish the purposes of the trust as determined from the trust instrument.' [Citation.]" (*Estate of Gump* (1991) 1 Cal.App.4th 582, 596 [citing Prob. Code, § 16040, subd. (a)].) "The trustee has a duty to administer the trust solely in the interest of the beneficiaries." (Prob. Code, § 16002, subd. (a).) With respect to Dae, the cotrustees breached these duties. As a result, he was improperly cheated out of millions of dollars.

9

cotrustees to alter, revoke or modify Dae's interest. For these reasons, I conclude that any challenge to the revocation of his interest (and the steps leading up to it) cannot be construed as a contest.

The majority suggests that if Dae wanted to avoid a contest, he should have focused his petition solely on his exclusion from the 2014 Gibb Trust. I part ways with the majority on this point. While the majority suggests that each decision made by the cotrustees must be viewed in a vacuum when courts are deciding if there is a contest, I conclude that the decisions must be viewed together and judged by the result that they achieved.

*Schwartz v. Schwartz* (2008) 167 Cal.App.4th 733 does not compel a contrary conclusion. It merely held that withdrawing a petition that amounts to a contest does not save a party from the penalty of a no contest clause. (*Id.* at pp. 744–746.) It does not hold that a no contest clause is triggered when a wronged beneficiary alleges a deprivation that took multiple steps and an interim step was legitimate.

My analysis is bolstered by Robert's declaration. He declared that Jean and he entered the split-dollar arrangements to minimize estate taxes based on the advice of financial advisors and legal counsel. He did not, however, specify how those arrangements minimized taxes, nor did he state whether all or only some of the steps leading up to the transfer of the insurance receivables into the 2014 Traver Trust and 2014 Gibb Trust were

10

necessary for the stated goal.[4]  I can only assume that all the steps were necessary, including the creation of the 2014 Traver Trust and the 2014 Gibb Trust.  In other words, they all had a common goal.  Those trusts did not preserve Dae's irrevocable remainder interest in Joan's share of the Residuary Trust following Jean's death.  If that is true, then every step the cotrustees took must be viewed as interrelated steps in a scheme designed to achieve a goal that thwarted the terms of the Residuary Trust.  While the cotrustees were granted the power to "borrow money for any trust purpose," their decision to borrow money to pay for the life insurance policies was not for a trust purpose because it ended up serving the interests of Robert's family at the expense of Dae.

My point is reinforced by the power of appointment in the 2014 Gibb Trust.  Joan was not able to give her share away to anyone she chose.  Her power could be exercised only in favor of "[Jean's] issue, and qualified charitable organizations[.]"  In other words, the cotrustees created a trust with a power of appointment that, if exercised, was highly likely to benefit Robert, his children, or both because—other than Dae—they were Jean's only remaining issue.

The trial court thought it was relevant that Jean and he received financial and legal advice before entering the split-dollar arrangements.  But there is no "professional advice defense" to

[4]  Robert declared that following Joan's death, the 2014 Gibb Trust received $16.2 million free of federal estate tax.  I presume this is accurate.  The point of noting that Robert did not explain whether all or some of the steps taken were necessary for tax planning purposes is this:  he has rendered the courts unable to properly judge the purpose of each of those steps.

11

breach of fiduciary duty.  In other words, a fiduciary does not have license to breach his or her duty just because a professional advised the course of action.

Robert suggests that all the blame for Dae being disinherited falls on the shoulders of Joan.  This is an attempt at misdirection, and it fails.  Robert and Jean gave Joan the power to disinherit Dae.  That was a violation of their fiduciary duties that should not be excused.

## III.  Even if Dae Filed a Contest, it was Not Frivolous.

As announced by the majority, the reasoning of *Estate of Ferber* (1998) 66 Cal.App.4th 244 indicates that a no contest clause is overbroad when it imposes a forfeiture for bringing a nonfrivolous claim of fiduciary misconduct.  In this case, it is undeniable that Jean and Robert breached their fiduciary duty to Dae by engaging in estate planning that operated to exclude him rather than include him.  Dae's petition is not totally and completely without merit (Code Civ. Proc., § 128.5, subd. (b)(2)) and cannot be labeled as frivolous.  After all, millions of dollars that should have gone to Dae pursuant to the unambiguous terms of the Residuary Trust ended up going to Robert and his family.

## IV.  Conclusion.

Robert failed to provide sufficient evidence demonstrating that his no contest petition had minimal merit.  I would reverse and remand with directions to the trial court to grant Dae's anti-SLAPP motion.  He should not have to incur the expense of defending against unmeritorious allegations that are seeking to

12

punish him for exercising his right of petition under our state and federal Constitutions.


_____, J.
ASHMANN-GERST